# United States Court of Appeals for the Federal Circuit

_____

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU DIS TICARET A.S., COLAKOGLU METALURJI A.S.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**v.**

**REBAR TRADE ACTION COALITION, BYER STEEL GROUP, INC., COMMERCIAL METALS COMPANY, GERDAU AMERISTEEL U.S. INC., NUCOR CORPORATION, STEEL DYNAMICS, INC.,**
*Defendants-Appellants*

_____

2024-1431

_____

Appeal from the United States Court of International Trade in No. 1:21-cv-00565-GSK, Judge Gary S. Katzmann.

_____

Decided: November 17, 2025

_____

ANDREW THOMAS SCHUTZ, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC,

argued for plaintiff-appellee Kaptan Demir Celik Endustrisi ve Ticaret A.S. Also represented by JORDAN CHARLES KAHN; MAX F. SCHUTZMAN, New York, NY.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM; HEATHER HOLMAN, WILLIAM MITCHELL PURDY, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

MAUREEN E. THORSON, Wiley Rein, LLP, Washington, DC, argued for defendants-appellants. Also represented by STEPHANIE MANAKER BELL, ALAN H. PRICE, JOHN R. SHANE.

JESSICA R. DIPIETRO, ArentFox Schiff LLP, Washington, DC, for plaintiffs-appellees Colakoglu Dis Ticaret A.S., Colakoglu Metalurji A.S. Also represented by DIANA DIMITRIUC QUAIA, NANCY NOONAN, LEAH N. SCARPELLI.

––––––––––––––––––

Before CHEN, LINN, and HUGHES, *Circuit Judges*.

LINN, *Circuit Judge*.

Rebar Trade Action Coalition and other domestic steel producers (collectively, "RTAC") appeal the decision of the Court of International Trade ("CIT"), sustaining the final decision by the U.S. Department of Commerce ("Commerce"), which determined that the Turkish government's subsidies to Nur, a shipbuilder and co-owned affiliate of Kaptan, should not be cross-attributed to Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"). *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 666 F. Supp. 3d 1334 (Ct. Int'l Trade 2023) ("*Kaptan II*").

Because Commerce's final remand decision is in accordance with law, adequately explained, and supported by substantial evidence, we *affirm*.

BACKGROUND

I

The Tariff Act of 1930 permits Commerce to impose countervailing duties ("CVDs") on merchandise imported from countries whose governments subsidized the manufacture, production, or export of said merchandise. 19 U.S.C. § 1671(a)(1). Commerce subsequently issued a regulation providing that:

> If there is cross-ownership between an input supplier and a downstream producer, *and production of the input product is **primarily dedicated** to production of the downstream product*, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv) (emphases added).[1]

Commerce explained that, as relevant to the "primarily dedicated" inquiry, the "main concern" addressed by the regulation "is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added

---

[1]    While Commerce has since issued a new version of the regulation, effective January 15, 2025, that more explicitly defines the factors relevant to the primarily dedicated inquiry, this appeal requires us to review Commerce's application of the 1998 version of the regulation. Accordingly, our analysis pertains to the 1998 version of the regulation.

product—the type of input product that is *merely a link in the overall production chain*." Countervailing Duties, 63 Fed. Reg. 65348, 65401 (Nov. 25, 1998) ("Preamble") (emphasis added). Commerce explained that this requirement was met in the case of "stumpage subsidies on timber that was primarily dedicated to lumber production and subsidies to semolina primarily dedicated to pasta production" and "in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Id.* (citing Final Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products from Canada, 57 Fed. Reg. 22570 (May 28, 1992); Final Affirmative Countervailing Duty Determination: Certain Pasta ("Pasta") From Italy, 61 Fed. Reg. 30288 (June 14, 1996)). Conversely, Commerce explained that duties should not be imposed to countervail subsidies to inputs that are not primarily dedicated to downstream products, like plastics incorporated into products like appliances or automobiles. *Id.*

## II

In 2014, Commerce issued a CVD order covering steel rebar from Turkey. Steel Concrete Reinforcing Bar From the Republic of Turkey: Countervailing Duty Order, 79 Fed. Reg. 65926 (Nov. 6, 2014). During a 2018 administrative review, Kaptan reported producing rebar by remelting steel scrap and listed only steel scrap as a raw material input to its rebar production. Kaptan reported that its steel scrap suppliers included affiliate Nur Gemicilik ve Tic. A.S. ("Nur"), Martas Marmara Ereglisi Liman Tesisleri A.S. ("Martas"), and Aset Madencilik A.S. ("Aset"). In 2020, Commerce selected Kaptan as a mandatory respondent in the administrative review.

Commerce subsequently determined that the steel scrap Kaptan received from Nur, Martas, and Aset was primarily dedicated to Kaptan's production of rebar and, thus, found that all three companies were cross-owned input

suppliers. While Martas and Aset received no countervailable subsidies, Nur did. Accordingly, Commerce preliminarily cross-attributed Nur's subsidies to Kaptan and proposed imposing a CVD on Kaptan's rebar to countervail the benefit it received from Nur's subsidies. After receiving comments challenging cross-attribution, Commerce continued to cross-attribute Nur's subsidies to Kaptan. Commerce explained that it had previously treated steel scrap as an input primarily dedicated to rebar production and the CIT had previously affirmed that decision. J. App'x 1832–33 (citing *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021)).

Kaptan appealed. The CIT concluded that Commerce did not adequately address whether steel scrap was merely a link in the chain of rebar production or distinguish prior cases that held that steel scrap was merely a byproduct. *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276, 1284–85 & n.3 (Ct. Int'l Trade 2023) ("*Kaptan I*"). Accordingly, the CIT remanded the matter for Commerce to explain its reasoning. *Id.* at 1285.

## III

On remand, Commerce identified five, non-exhaustive factors relied upon in its prior decisions to assess whether the production of an input is primarily dedicated to downstream production, namely:

[1] Whether an input supplier produced the input;

[2] Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

[3] Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described

in the Preamble, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

[4] Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

[5] Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the Preamble such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

J. App'x 2181–82 (numerals added).

Commerce also concluded that the amount of scrap provided was not relevant. *Id.* at 2182.

In its Draft Remand Results, Commerce once again found that Nur's steel scrap was primarily dedicated to Kaptan's rebar production. J. App'x 2182, 2188. Specifically, while recognizing that steel scrap could be used to make a variety of different products, Commerce concluded that: (1) Nur provided steel scrap as a part of a vertically integrated supply process; (2) steel scrap was a critical input; and (3) Nur's scrap steel was provided exclusively to Kaptan's production chain. *Id.* at 2182–83. Further, Commerce analogized to *Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41964 (July 18, 2014), in which Commerce determined that steel scrap used to produce intermediate products and, in turn, subject

merchandise was merely a link in the chain of production of said merchandise. *Id.* at 2185. Accordingly, Commerce initially concluded that Nur's steel scrap was likewise a mere link in the chain of Kaptan's rebar production and that "Nur was a cross-owned input supplier of products . . . deemed to be primarily dedicated to downstream steel production." J. App'x 2170, 2185.

After receiving comments from Kaptan, however, Commerce reversed course and found that "Nur does not constitute a cross-owned input supplier of products (i.e., steel scrap) deemed to be primarily dedicated to downstream steel production." J. App'x 2223–24. Commerce concluded that although three of the factors weighed in favor of cross-attribution, Nur's steel scrap was not a mere link in the chain of Kaptan's rebar production but rather a common input used in a wide variety of products and industries. *Id.* at 2239–40. Further, Commerce found that Nur's steel scrap was unprocessed and, therefore, was not prepared for downstream use. *See id.* at 2239. Additionally, Nur's business activity (i.e., shipbuilding) was far removed from Kaptan's downstream production processes such that "Nur's business activity is not 'dedicated almost exclusively to the production of a higher value-added product' in the manner suggested by the Preamble." *Id.* at 2241. Commerce, therefore, found that Nur's steel scrap was not primarily dedicated to Kaptan's rebar production and, by extension, Nur did not qualify as a cross-owned input supplier. Accordingly, Commerce reduced Kaptan's CVD rates to *de minimis* levels.

RTAC appealed and challenged Commerce's findings that Nur's steel scrap was not a mere link in the chain of Kaptan's rebar production and that Nur's business activities weighed against cross-attribution. *See Kaptan II*, 666 F. Supp. 3d at 1341.

The CIT sustained Commerce's decision in full. *Id.* at 1336, 1351. The CIT concluded that Commerce's finding

that Nur's scrap was not a mere link in the chain of production was supported by evidence that Kaptan produced a variety of products (apart from subject rebar) using steel scrap. *Id.* at 1341–44. The CIT also rejected RTAC's argument that Commerce's analysis was inconsistent with the regulation or Preamble as undeveloped, *id.* at 1345–46, and concluded that Commerce's findings that Nur's business activities weighed against cross-attribution were adequately explained and supported by substantial evidence. *Id.* at 1347–50.

RTAC appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### I

This Court "review[s] CIT decisions de novo and appl[ies] anew the same standard [the CIT] used." *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020). But this Court will not ignore the informed judgment of the CIT. *Id.* Commerce's determinations will be upheld unless they are unsupported by substantial evidence or otherwise not in accordance with law. *Id.* Substantial evidence is evidence that a reasonable person might accept as adequate to support a conclusion. *Id.* Issues concerning the proper interpretation of a regulation are reviewed de novo. *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 894 (Fed. Cir. 2023).

### II

RTAC asks this court to reinstate Commerce's original decision, which held that Nur's steel scrap was primarily dedicated to Kaptan's rebar production. RTAC contends that Commerce's original decision was consistent with the regulation, adequately explained, and supported by substantial evidence.

Kaptan argues that Commerce's original determination should not be reinstated. Specifically, Kaptan argues that because Commerce did not issue its final remand decision under protest, that decision (not its original decision) reflects the culmination of the agency's considered judgment and thus is the decision entitled to deference. Moreover, Kaptan contends that the original determination properly would be reinstated if the CIT abused its discretion by remanding for a further explanation. And Kaptan contends that the CIT did not abuse its discretion because its remand simply asked Commerce to explain why, in its prior decision, Commerce considered the byproduct nature of steel scrap but declined to do so in this case.

We agree with Kaptan that the CIT's decision in *Kaptan I* is properly reviewed for an abuse of discretion. A challenge to a prior CIT decision is generally assessed under the substantial evidence standard when the CIT evaluated Commerce's factual basis. *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1357 (Fed. Cir. 2010). A remand due to the inadequacy of Commerce's explanation, however, is reviewed under the more deferential abuse of discretion standard. *Id.* at 1356. Here, the CIT remanded exclusively based on the insufficiency of Commerce's explanation. *See Kaptan I*, 633 F. Supp. 3d at 1285 ("[T]he court remands Commerce's Final Results for further explanation and review on Commerce's finding that Nur was a cross-owned input supplier of input products primarily dedicated to the production of downstream products."). Accordingly, the abuse of discretion standard applies.

The CIT did not abuse its discretion by remanding Commerce's original decision for further explanation. For one, RTAC does not argue that the CIT's remand decision constituted an abuse of discretion. Additionally, the CIT's decision to remand the matter to Commerce for further explanation was within the bounds of the court's discretion under the circumstances. The CIT observed that

Commerce did not adequately address two factors that had previously been recognized as important to the primarily dedicated inquiry: (1) whether the input supplied was merely a link in the chain of production of the downstream product and (2) the byproduct nature of the input. *See Kaptan I*, 633 F. Supp. 3d at 1284 & n.3. Accordingly, we conclude that the CIT did not abuse its discretion by requiring Commerce to address these important considerations. We, thus, confine our further analysis to Commerce's decision in the Final Remand Results.

## III

Commerce found that (1) the unprocessed steel scrap was a common input used in a variety of products and industries and (2) Nur's business activities were not dedicated almost exclusively to the production of a higher value-added product. RTAC challenges both findings. We address each argument in turn.

## A

RTAC argues that Nur's scrap is a mere link in the production chain of Kaptan's rebar, and that substantial evidence does not support Commerce's finding to the contrary because Commerce did not identify the other industries that use unprocessed scrap. RTAC also argues that Commerce provided no evidence to support its conclusion that Nur's scrap is a common input to a variety of products and industries, and that scrap does not have obvious uses apart from being melted down to form steel products, like Kaptan's rebar. RTAC contends that the fact Kaptan uses Nur's scrap to produce non-subject steel products is immaterial to whether Nur's scrap production is primarily dedicated to Kaptan's downstream products because the regulation does not require the "downstream product" to be subject merchandise.

Kaptan and the government argue that RTAC improperly frames the question Commerce was tasked with

answering. Specifically, Commerce did not have to identify industries *other than steelmaking* that use scrap as an input to demonstrate that such scrap was a common input; instead, Commerce needed only to assess the range of steel products that steel scrap could be used to produce.

We agree with Appellees. Commerce identified multiple prior decisions involving different industries using steel scrap as an input.[2] Further, Commerce found that Kaptan uses steel scrap to produce a variety of articles in addition to subject rebar, including non-subject rebar, other bars, and angle profiles. J. App'x 2248–49. RTAC's argument that all products made from melting steel scrap fall within the "steelmaking industry" simply reflects RTAC's disagreement with Commerce's framing of the relevant industries and the determination of when one industry ends and another begins. This is ultimately a factual matter best left to Commerce's expertise and RTAC has not shown that Commerce's assessment was unreasonable. Accordingly, we conclude that substantial evidence supports Commerce's finding that steel scrap was a common input to a variety of industries.

Next, RTAC argues that Commerce's reliance on the unprocessed nature of Nur's scrap is unsupported and inadequately explained. Specifically, RTAC argues that Commerce cited the remand results in another appeal involving cut-to-length steel plate, but those results were subsequently rejected by the CIT. And, RTAC contends, no

---

[2] These decisions also confirm that Commerce has not endorsed a categorical rule that steel scrap is always primarily dedicated to downstream steel production. *See, e.g., Issues and Decision Memorandum For the Final Affirmative Determination of the Countervailing Duty Investigation of Forged Steel Fluid End Blocks From the Federal Republic of Germany*, 85 ITADOC 80011 (Dec. 11, 2020).

other prior Commerce decision treated the distinction between processed and unprocessed scrap as significant.

The government responds that Commerce adequately explained its reasons for treating the unprocessed nature of Nur's scrap as significant. Gov't Br. 22–23 (citing J. App'x 2239 ("Whether or not scrap is generated or otherwise prepared for downstream products in the production line is a factor to consider when determining whether an input is primarily dedicated to the production of a downstream product.")). The government also argues that the CIT did not reject the significance of the distinction in the cut-to-length steel plate case; instead, the court remanded for Commerce to reconsider or further explain its reasoning.

We agree with the government. Commerce's consideration of the unprocessed nature of Nur's scrap was appropriate and sufficiently explained. Specifically, Commerce explained that the extent to which an input is generated or processed for downstream products is relevant when determining whether the input is a mere link in the production chain. J. App'x 2239. Thus, the more an input supplier does to prepare an input for downstream production, the stronger the inference becomes that the input is primarily dedicated to that production. And the appropriateness of this inference is plain from the regulation's use of the term "dedicated." 19 C.F.R. § 351.525(b)(6)(iv); *see also Dedicated*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/dedicated (defining "dedicated" as "given over to a particular purpose"). Commerce then reasonably concluded that the unprocessed nature of Nur's scrap indicated that it was, "[i]n this regard," not a mere link in the production chain as it was not processed before its sale to Kaptan. J. App'x 2239. Finally, Commerce was permitted to consider its prior decisions regarding unprocessed steel scrap for their persuasive value.

RTAC also argues that steel scrap has the same close physical relationship with rebar that stumpage has with lumber and semolina has with pasta. RTAC contends that "[a]n input used in producing a limited group of downstream goods to which the input bears a close physical relationship (*i.e.*, to which it imparts critical characteristics) is 'primarily dedicated' to those downstream goods within the meaning of the regulation." Appellants' Br. 13.

We reject RTAC's argument because the regulation, read in view of the Preamble, indicates that the physical relationship between the input and downstream products is a relevant but not the sole consideration in the primarily dedicated analysis. We have recently recognized that the examples in the Preamble indicate that "an input product and a downstream product that share a physical connection *may* trigger" cross-attribution and that "the physical connection between the input and the downstream products is an important consideration" in the primarily dedicated analysis. *Gujarat Fluorochemicals Ltd. v. United States*, 153 F.4th 1376, 1382–83 (Fed. Cir. 2025) (emphasis added). But other considerations are also relevant to the inquiry and must be weighed against the physical relationship if present. The purpose or primary use of an input is also a relevant consideration. Thus, even if RTAC were correct that steel scrap and rebar have the close physical relationship that exists between semolina and pasta, this would show only that a reasonable person could find that Nur's steel scrap is primarily dedicated, not that no reasonable person could find otherwise.

Lastly, RTAC contends that Commerce failed to explain how Nur's scrap differed from the scrap provided by Kaptan's other suppliers, Martas and Aset, and found to be "primarily dedicated" to Kaptan's rebar production. Kaptan contends that it did not challenge Commerce's conclusion that Martas and Aset were cross-input suppliers because Commerce determined that neither firm received countervailable subsidies; thus, Commerce's finding that

Martas and Aset were cross-owned input suppliers under the rule did not affect the CVD rates imposed on Kaptan.

We agree with Kaptan. Because neither Martas nor Aset received countervailable subsidies, the issue of whether Martas's and Aset's steel scrap was primarily dedicated to Kaptan's rebar production was moot. Commerce did not need to distinguish from the dicta of its prior non-cross-attribution determination as to Martas and Aset to sufficiently explain whether Nur's steel scrap was primarily dedicated to Kaptan's production.

B

Commerce's conclusion that Nur's production of steel scrap was not primarily dedicated to Kaptan's rebar production also rested on its finding that Nur's primary business activity, namely shipbuilding, was not "dedicated almost exclusively to the production of a higher value-added product." J. App'x 2241.

RTAC argues that Commerce's analysis inappropriately focused on Nur's business activities rather than on the nature of the input and its role in the downstream production as required by the Preamble. RTAC contends that the term "business activity" appears in neither the regulation nor the preamble. Instead, "the Preamble indicates that the salient issue is whether the input is, by its nature, usable only in producing a narrow subset of goods and/or is a primary input into such goods." Appellants' Br. 36. In its reply, RTAC clarifies that it does not contend that Commerce may not consider an input supplier's business activities. Rather, RTAC takes issue with the weight Commerce afforded to Nur's business activities in the primarily dedicated analysis. *See* Appellants' Reply 26 ("The weight that [Commerce] has placed on Nur's status as a shipbuilder is inadequately explained and supported in light of the regulations and the Preamble.").

The government argues that RTAC forfeited its argument that business activities are not relevant to the primarily dedicated inquiry. On the merits, the government contends that the examples in the Preamble are merely exemplary, not exhaustive; thus, RTAC's attempt to cabin the scope of the primarily dedicated inquiry based on the Preamble's examples should be rejected.

We reject RTAC's contention that the weight Commerce afforded to Nur's status as a shipbuilder was inconsistent with the regulation and Preamble. The regulation does not expressly recite the phrase "business activities," but it requires the Secretary to cross-attribute subsidies when "*production* of the input product is primarily dedicated to production of the downstream product." 19 C.F.R. § 351.525(b)(6)(iv) (emphasis added). While the Preamble indicates that the physical relationship between the input and downstream products is a relevant and important consideration, the text of the regulation confirms that the production process yielding the input product is also relevant and important to the determination of whether input "production" is "primarily dedicated" to the downstream production. Further, consideration of the input supplier's activities leading up to the input supplier's provision of the input to the downstream producer comports with the Preamble's stated goal of discerning subsidies intended to benefit downstream products from those that are not so designed. *See* Preamble, 63 Fed. Reg. at 65401.

With this understanding, we discern no error in Commerce's consideration of Nur's primary business activity as a shipbuilder. Nur produced steel scrap as a byproduct of its shipbuilding activities. *See* J. App'x 2252–53. And Commerce concluded that "Nur's production of ships is sufficiently removed from Kaptan's Demir's production of downstream products, including rebar, such that it cannot be considered 'dedicated almost exclusively to the production of a higher value-added product.'" J. App'x 2252. Accordingly, Commerce, consistent with the text of the

16    KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S. v. US

regulation, assessed the relationship between the production process of the input product and that of the downstream product but found that the former was not primarily dedicated to the latter.

Absent a suggestion in the regulation or the Preamble confirming that certain factors ought to be afforded particular weight, the determination of how much weight to afford each factor in the primarily dedicated analysis is a fact-driven inquiry best left to Commerce's expertise. Accordingly, we will not (and indeed cannot) reweigh the evidence on appeal. *Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1257–58 (Fed. Cir. 2023).

## CONCLUSION

We have considered RTAC's other arguments but find them unpersuasive. For these reasons, we *affirm*.

## AFFIRMED